**Jeffrey M. WICKS, Plaintiff,**

v.

**RILEY COUNTY BOARD OF COUNTY COMMISSIONERS, the City of Manhattan, Kansas, Defendants.**

**No. 98–4049–DES.**

United States District Court, D. Kansas.

Nov. 30, 2000.

---

Patrick R. Barnes, Scott, Quinlan & Hecht, Topeka, KS, for plaintiff.

Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendants' Motion for Summary Judgment (Doc. 32) brought pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Plaintiff's First Amended Complaint (Doc. 13) presents two claims: the first is a discrimination claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the second is a retaliatory discharge claim brought under state law. For the following reasons, defendants' motion is granted.

## I. BACKGROUND

Plaintiff was employed by defendants as an Animal Control Officer ("ACO") from September 1991 till his eventual termination in March 1997. On April 27, 1996, plaintiff was involved in an on-the-job automobile accident. He asserts injuries sustained in that accident have permanently impaired him, and that when he attempted to return to work, defendants terminated him in violation of the ADA and state law.

Throughout his employment, plaintiff was one of only two ACOs employed by the defendants. Due to the "on-call" nature of the job, the two ACOs split the week into two three and a half day shifts. Plaintiff generally worked eleven hours per day with his shift beginning on Wednesday afternoon and concluding on Saturday evening. With this arrangement, only one ACO was ever on duty at any given time. For the majority of plaintiff's tenure the second ACO was John Yadon—who also served as plaintiff's immediate supervisor. Charles Murphy, Director/Health Officer of the Riley County/Manhattan Health Department, served as supervisor to both plaintiff and Mr. Yadon.

Plaintiff's responsibilities were primarily three-fold: patrolling, in an official vehicle, throughout the city of Manhattan; responding to calls for assistance, which were coordinated through the Riley County Police Department ("RCPD"); and maintaining the defendants' animal shelter. The position of ACO requires some heavy physical exertion, including occasionally lifting and/or carrying animal carcasses weighing up to 150 plus pounds.

Within both parties' filings, a substantial amount of effort is spent detailing plaintiff's work history. This year by year description, which is substantially uncontroverted, casts plaintiff as an average worker. Plaintiff was regularly evaluated, with his reviews showing both negative and positive characteristics. Routinely plaintiff was given negative reports concerning his response times to emergency calls received from the police dispatcher. The court does not find it necessary to discuss in further detail plaintiff's performance evaluations prior to his on-the-job injury. The court does make note, however, that in plaintiff's final evaluation before his accident he was considered to be meeting or exceeding all of the standards within his employment responsibilities.[1] (Ex. 25).

1. The appraisal period in question ran from April 1, 1995, to March 31, 1996. The evaluation details six tasks assigned to plaintiff. In each task plaintiff is assigned one of five ratings: outstanding, above standards, meets standards, needs improvement, or unacceptable.

In the first task—"Enforce animal laws and codes of the city, county and state"—plaintiff received an "above standards" rating. The reviewer, Mr. Yadon, stated that plaintiff was "[g]ood at enforcement of ordinances and laws but does not always interpret the intent of the ordinances correctly. The area of interpreting ordinances has improved."

In the second task—"Respond to calls from Riley County Police Department dispatcher"—plaintiff received a "meets standards" rating. Mr. Yadon noted that plaintiff "[s]till has conflict with RCPD dispatcher and at times is slow to respond to calls."

In the third task—"Patrol in the city Manhattan"—plaintiff received a "meets standards" ratings. Mr. Yadon stated that plaintiff "[s]pend[s] too long at the animal shelter and RCPD."

On April 27, 1996, while driving his official vehicle, plaintiff's vehicle was struck from behind. As a result of this collision, plaintiff suffered neck and back trauma, which prevented him from returning to work until October 2, 1996.[2] During this period of convalescence, plaintiff was seen by several doctors and was eventually referred to Eric E. Hansen, M.D. Plaintiff began a program of work conditioning under Dr. Hansen on August 20, 1996, which culminated in plaintiff's discharge to full duty status for a trial basis on October 1, 1996. Later, on February 4, 1997, Dr. Hansen opined that plaintiff suffered a nine percent whole body permanent impairment due to cervical lumbar strain and degenerative disc disease.

On September 30, 1996, the day before his discharge to full duty status, plaintiff underwent a physical examination by Kim Frankenfield, M.S. The tests showed that "[a]t discharge, patient was successfully demonstrating general tolerances for his job such as driving, lifting, bending, reaching and squatting." (Ex. 36).[3]

Upon his initial return to work, plaintiff asked for and was granted an additional thirty minutes of break time. Plaintiff allegedly needed this time to exit from his patrol vehicle and change position to alleviate his neck and back pain. After two weeks, however, plaintiff was denied the additional break time. Plaintiff did use a lumbar cushion when driving his patrol vehicle. When plaintiff complained about his pain to Mr. Murphy, he was instructed to reduce the air pressure in his vehicle's tires, yet plaintiff was warned that patrolling was an essential element of his job.

Plaintiff did request from Mr. Yadon a two-wheeled dolly and access to a patrol truck with a ramp. Plaintiff alleges that a ramp and dolly system would have allowed him to lift heavier animal carcasses into the truck without pain or re-injury. Defendants argue that plaintiff failed to follow the proper acquisition procedures in requesting this equipment, yet it is undisputed that plaintiff informed Mr. Yadon about his request and no dolly was ever provided.

Plaintiff continued performing his employment tasks, yet it appears he persisted in taking additional breaks when patrolling, even though such actions were clearly unauthorized by Mr. Yadon and Mr. Murphy. Plaintiff asserts that he was willing to add minutes to his shift to compensate for the break time. Additionally, he claims that when not patrolling he returned to the animal shelter and assisted the staff. However, in an evaluation review appraising plaintiff's performance from April 1, 1996, to November 13, 1996, Mr. Yadon rated plaintiff as "unaccepta-

---

In the fourth task—"Apprehend, transport, and assist animals"—plaintiff received a "meets standards" ratings. Mr. Yadon included that plaintiff's "[r]esponse to calls in the city has improved but is still low."

In the fifth task—"Assist with cleaning and caring for the animals at the shelter"—plaintiff received an "above standards" rating. Mr. Yadon noted that plaintiff "[h]as improved but is still slow in cleaning but does a good job."

In the sixth and final task—"Drive animal control vehicle and assist with maintenance of the vehicle and shelter"—plaintiff received an "above standards" rating. Mr. Yadon's only addition states that plaintiff was "[g]ood in cleaning vehicle and maintenance." (Ex. 25).

2. During his time off of work, plaintiff embarked on a road trip from Kansas to Florida. During this trip plaintiff admitted that although other licensed drivers were available, he did approximately ninety-eight percent of the driving.

3. The tests performed by Ms. Frankenfield revealed that plaintiff could perform the following tasks:

1. Floor to waist lifting: 150 pounds maximum, 45 pounds repetitively.
2. Waist to chest lifting: 80 pounds maximum, 50 pounds repetitively.
3. Chest to overhead lifting: 60 pounds maximum, 35 pounds repetitively.
4. Carry: 70 pounds maximum, 45 pounds repetitively.
5. Push force: 140 pounds maximum, 65 pounds repetitively.
6. Pull force: 155 pounds maximum, 65 pounds repetitively.

ble" in his task of patrolling. Mr. Yadon noted that plaintiff "[h]as trouble with patrolling since his back and neck injury. Needs periodic breaks to rest." (Ex. 48).

On November 14, 1996, while on duty, plaintiff opened a sealed envelope addressed to "Animal Warden, John Yadon." Inside was a typed, unsigned letter[4] presenting a complaint regarding plaintiff's work performance. Plaintiff alleges that he inadvertently opened the envelope, however, he immediately discussed the letter and its contents with Mr. Murphy. The complaint's substance proved to be groundless, and plaintiff was completely vindicated in regards to the incident.

Plaintiff, however, was upset by the complaint and demanded an apology from the RCPD. Mr. Murphy and Mr. Yadon attempted to get plaintiff an apology, yet the RCPD refused their request. Plaintiff filed a grievance concerning the matter, again demanding that the RCPD issue an apology. Apparently before Mr. Murphy had dealt with the grievance, plaintiff placed a phone call to Bob Snead, acting President of the Riley County–Manhattan Board of Health, describing his difficulty in having his grievance properly processed.

On January 13, 1997, Mr. Murphy informed plaintiff that he should attempt to resolve his conflict with the dispatchers through informal channels. Plaintiff, Mr.

Yadon, and Mr. Murphy had several discussions aimed at resolving the matter, but plaintiff was adamant in his desire to have RCPD apologize. On February 7, 1997, plaintiff told Mr. Murphy that he was going to appeal his grievance to the Riley County–Manhattan Health Board. Referring to the Riley County–Manhattan Health Department Personnel Manual, Mr. Murphy informed plaintiff that this matter was not appealable, and plaintiff was told not to attempt any appeal.[5]

On February 17, 1997, plaintiff wrote a letter to Mr. Snead informing him of his intent to appeal his grievance. In response, Mr. Snead sent a memorandum to the other members of the Board apprizing them of the situation and opining that the Board had no basis to hear plaintiff's appeal. Later, on February 28, 1997, the Board met and decided not to consider plaintiff's appeal.

Plaintiff received his final performance review on February 27, 1997, which covered the appraisal period of December 19, 1996, to February 19, 1997. Mr. Yadon gave plaintiff on overall rating of unsatisfactory and recommended that plaintiff should not be retained. Thereafter, in a letter dated March 3, 1997, Mr. Murphy informed plaintiff that he was being terminated effective March 7. Mr. Murphy stated that plaintiff was being dismissed, pursuant to the Personnel Manual, because he

---

4. The letter reads as follows:

> At 1846hrs, 14 Nov. 96 we received a call about a stray dog at 1909 Dogwood. We called Animal Wardon Wicks directly after we received the call at 1846hrs. He then called us on the phone and said he was in the building and what did we want. We advised him of the call and he said he wasn't going to take it stating "They've already given me my walking papers on that."
>
> He was hiding in the back of the station for 30 or more minutes. This is not the first time he's shirked his duties. We wanted to bring this to your attention so it could be handled on your level.
> Thank you,
> Dispatch

(Ex. 49) (under the word "Dispatch" a handwritten, capital letter D appears).

5. Section 701 of the Personnel Manual states: "The Health Board shall hear appeals taken to it pursuant to these regulations, or any amendments thereto, concerning demotion, dismissal or suspension of a permanent employee . . . ." (Ex. 2).

Plaintiff presents several arguments as to why the grievance was appealable. For instance, plaintiff directs the court's attention to section 501(B) of the Personnel Manual, which states that "[t]he staff should immediately contact any member of the Board of Health if they observe any of the following behaviors or other extreme circumstances: incompetent, tyrannical, illegal or sexual harassing behavior." (Ex. 2). At this time, however, the court need not address the merits of this argument.

had received two unsatisfactory evaluations in the previous ninety days. However, in a letter dated March 6, 1997, plaintiff informed Mr. Murphy that he was going to appeal his dismissal because his evaluations had in fact not been within ninety days. In a letter also dated March 6, Mr. Murphy responded by noting that plaintiff was correct, for his two negative evaluations were received within a ninety-eight day span. The letter, therefore, modified the reason for plaintiff's termination. Mr. Murphy offered the following four rationales for dismissing plaintiff:

> You continue to pursue an apology from the police department after you were told that seeking an apology was not an appropriate response to resolving the dispatch issue.

> You appear to have difficulty performing your duties due to physical limitations.

> You have received numerous unsatisfactory evaluations from your supervisors.

> I gave you specific instructions not to contact the Board of Health because you did not have an appealable issue. I also read you the portions of the manual that applied to appeals when I gave you this instruction. You ignored my instruction and contacted the President.

(Ex. 59). Plaintiff appealed Mr. Murphy's decision. Thereafter, the Board heard plaintiff's appeal and denied plaintiff's request.[6]

As to plaintiff's first claim, defendants' motion argues plaintiff has failed to show that he is disabled as defined under the ADA, in the alternative, defendants assert that plaintiff was not qualified to perform his job as defined under the ADA, and finally, defendants claim that plaintiff's adverse employment action was not motivated by their knowledge of plaintiff's alleged impairment. In regards to the second claim, defendants again assert that plaintiff's termination was not motivated by their knowledge of his impairment or subsequent workers' compensation claim.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. 2548. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (interpret-

---

**6.** The court has not been supplied with either minutes or a transcript of those proceedings.

ing Fed.R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. 2548. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) ("The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues."). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Plaintiff's ADA Claim

#### 1. Proper Analytical Framework

The ADA prohibits a covered entity form discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual

holds or desires." 42 U.S.C. § 12111(8). *See, e.g., Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 897 (10th Cir.1997); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1123 (10th Cir.1995).

An ADA plaintiff may present evidence of the alleged discrimination under two different analytical frameworks. Under the first theory, a plaintiff employs circumstantial evidence of the alleged discrimination in conjunction with the familiar burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997) (applying *McDonnell Douglas* in the ADA context). If, however, a plaintiff presents direct evidence regarding the defendant's discrimination, then the burden-shifting analysis becomes obsolete. *See Morgan,* 108 F.3d at 1323 n. 3 ("If the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate."). Therefore, when a plaintiff produces direct evidence, the second analytical framework—premised on *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) and generally labeled the "mixed-motive" analysis—is used. *See Equal Employment Opportunity Comm'n v. Wiltel, Inc.,* 81 F.3d 1508, 1514 (10th Cir.1996). Under this framework, once a plaintiff produces direct evidence[7] demonstrating that the defendant's employment decision was motivated by an illegitimate criterion under the ADA, the burden is then on the defendant to prove by a preponderance of the evidence that it would have taken the same action even if the illegitimate criterion was

---

**7.** At least one circuit has disapproved of the "direct" versus "indirect" distinction. *See Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 202 n. 1 (8th Cir.1993) (per curiam) ("We conclude that there is no restriction on the type of evidence a plaintiff may produce to demonstrate that an illegiti-

mate criterion was a motivating factor in the challenged employment decision. The plaintiff need only present evidence, be it direct or circumstantial, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision.")

not relied upon in the decision making process. *See Price Waterhouse,* 490 U.S. at 245, 109 S.Ct. 1775.

■ Unlike claims of race, age, or gender discrimination, the initial hurdle to a plaintiff's ADA case is at times, like in the present case, controverted. Therefore, regardless of the operating analytical framework,[8] the court must first determine (1) whether plaintiff is disabled and (2) whether he can, with or without reasonable accommodation, perform the essential functions of his job. *See* 42 U.S.C. § 12111(8). *See, e.g., Penny v. United Parcel Serv.,* 128 F.3d 408, 414 (6th Cir.1997) ("Obviously, the first requirement that any ADA claimant must meet is to demonstrate that he or she is disabled within the meaning of the statute and regulations.").

## 2. Plaintiff's Disability

Under the ADA, a person is considered to have a disability if that individual either (A) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) has a record of such an impairment, or (C) is regarded by the employer as having such an impairment. 42 U.S.C. § 12102(2). Plaintiff presents arguments under all three subsects, so the court will address each in turn.

### a. Limitation of Major Life Activities

■ There exists a three-step process for determining whether a plaintiff has a disability under the first subsection of the ADA's disability definition. *See Bragdon v. Abbott,* 524 U.S. 624, 631–41, 118 S.Ct.

2196, 141 L.Ed.2d 540 (1998). First, the court must determine if plaintiff suffers from a physical or mental impairment. *Id.* Plaintiff's back injury is clearly a physical impairment affecting his musculoskeletal system. *See* 29 C.F.R. § 1630.2(h)(1). Defendants concede this point. The second step in the analysis is to identify those life activities affected by the impairment and determine whether they are "major" life activities under the ADA. *Bragdon,* 524 U.S. at 631–41, 118 S.Ct. 2196. Plaintiff claims that he is limited in the life activities of lifting, standing, sitting, and working. Defendants do not contest that these life activities are "major" life activities under the ADA.[9] The third and final step in the process inquires into whether plaintiff's impairment "substantially limits" the major life activities identified in step two. *Id.* Defendants claim that plaintiff has failed to demonstrate that his impairment substantially limits any of his identified major life activities.

The Equal Employment Opportunity Commission's ("EEOC") regulations implementing the ADA define the term "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

8. As is to be expected, the parties disagree as to which framework is appropriate in the present case. Plaintiff seeks the mixed-motive analysis, whereas defendants claim that the traditional burden-shifting theory is appropriate. Both parties, however, agree that the initial issue for consideration is whether plaintiff qualifies under the ADA. The decision regarding which analytical framework to employ impacts the court's analysis only when considering the later question of defendants' motive. The court, therefore, reserves its ruling on this matter.

9. Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching. *See* 29 C.F.R. Pt. 1630, App. 1630.2(i). *See also Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1173 (10th Cir.1996) (identifying working and lifting as major life activities under the ADA).

29 C.F.R. § 1630.2(j)(1). The regulations recommend that the following factors be considered in determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

### (1) Lifting

As to plaintiff's claim of substantially limited lifting ability, there exists a large body of case law suggesting that plaintiff would not be disabled under the ADA. According to the tests performed by Ms. Frankenfield, plaintiff is able to lift one hundred and fifty pounds off the floor, while lifting forty-five pounds repetitively. Several circuits, including the Tenth Circuit, have found more severe lifting restrictions to be insufficient, as a matter of law, for inclusion under the ADA. *See, e.g., Thompson v. Holy Family Hosp.,* 121 F.3d 537, 539–40 (9th Cir.1997) (finding restriction from lifting more than twenty-five pounds not substantially limiting); *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 (4th Cir.1996) (same), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997); *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1319 (8th Cir.1996) (same); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir.1995) (individual with impaired arm who could not do heavy lifting or repetitive rotational movements and who had difficulty picking things up from the floor and holding things up high was not disabled); *Huckans v. United States Postal Serv.,* 201 F.3d 448, 1999 WL 1079619 (10th Cir.1999) (table) (finding thirty-five pound lifting restriction not substantially limiting); *Barnard v. ADM Milling Co.,* 987 F.Supp. 1337, 1342 (D.Kan.1997) (finding a forty-two pound restriction not substantially limiting). *Cf. Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174 (10th Cir.1996) (finding plaintiff who could not lift items over fif-

teen pounds and only could lift items weighing less than fifteen pounds occasionally presented genuine issue of material fact concerning her lifting ability).

In response to this contrary case law, plaintiff presents the supplemental affidavit of Dr. Hansen. Dr. Hansen states:

> Mr. Wicks' impairment significantly limits his ability to perform major life activities when compared to the ability of the average person in the general population to perform those activities, in that Mr. Wicks would have pain which arises with the progression of the duration and frequency of activities such as lifting, stooping, bending and twisting in unusual postures and situations or as repetitive activities, and while driving for long periods of time.

(Hansen Supp. Aff. at 2). Plaintiff argues that Dr. Hansen's opinion creates a genuine dispute as to whether his life activities, including lifting, are substantially limited, so demonstrating his disability status under the ADA. The court rejects this rationale. First, the opinion of Dr. Hansen will not be considered by the court because it represents an inadmissible legal conclusion. *See Burkhart v. Washington Metro. Area Transit Auth.,* 112 F.3d 1207, 1212 (D.C.Cir.1997) ("[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied."); *Specht v. Jensen,* 853 F.2d 805 (10th Cir.1988) (en banc) (reversible error to allow an expert witness who was an attorney to give his opinions on what was required to make consent to a search effective). *See also* Fed.R.Evid. 704.

Furthermore, because the affidavit is couched in sweeping and conclusory language, it fails to state "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Doren v. Battle Creek Health Sys.,* 187 F.3d 595, 598–99 (6th Cir.1999) (rejecting as insufficient to defeat summary judgment a doctor's affi-

davit stating in conclusory terms that the plaintiff's "impairments preclude her from engaging in most of [sic] jobs in the local and national economy as a registered nurse").

Considering the case law cited above, and in light of plaintiff's lifting restrictions as found by Ms. Frankenfield, the court finds that plaintiff does not have a "disability" as defined by the ADA in terms of the major life activity of lifting.[10]

### (2) Sitting

The court next addresses plaintiff's claim that he is substantially limited in his ability to sit. The only evidence presented on this issue relates to plaintiff's ability to sit and drive a motor vehicle. Plaintiff presents Dr. Hansen's supplemental affidavit, which opines: "One would expect Mr. Wicks to be able to sit for a period of approximately two hours before the need to take a break would arise." Even after granting plaintiff all possible inferences, the court finds that this restriction is insufficient to substantially limit plaintiff's ability to sit. *See Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 644 (2d Cir.1998) (plaintiff's vague assertions that he could not "sit 'too long,' and [that] 'prolonged' sitting is a problem at work" and that he could not take " 'a two or three or four hour drive' without stopping to stretch his legs" were insufficient to allow the jury to reasonably conclude that his impairment substantially limited his ability to sit); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 616 (8th Cir.1997) (plaintiff's statement that she was unable to sit for longer than thirty minutes was insufficient to establish disability under the ADA); *Horth v. General Dynamics Land Sys., Inc.,* 960 F.Supp. 873, 878 (M.D.Pa. 1997) (inability to sit more than two hours

did not constitute substantial limitation on major life activity of sitting).

### (3) Standing

As to the third activity, standing, plaintiff has presented no evidence demonstrating that his impairment substantially limits his ability to stand. The court, therefore, finds that plaintiff is not disabled as to this major life activity.

### (4) Working

When evaluating whether a plaintiff's impairment substantially limits his/her life activity of working, the EEOC regulations include three additional factors that may be considered:

(A) [t]he geographical area to which the individual has reasonable access;

(B) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii).

In *Bolton v. Scrivner, Inc.,* 36 F.3d 939 (10th Cir.1994), *cert denied,* 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995), the court held that the mere existence of physical restrictions, particularly those relating to manual labor, do not necessarily

---

**10.** Contrary to plaintiff's assertion, the fact that he was diagnosed with a nine percent whole body impairment does not create a dispute as to whether he is disabled. The court must look beyond the classification of plaintiff's impairment and examine the effect the impairment has on his ability to function.

*See* 29 C.F.R. Pt. 1630, App. 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

by themselves establish that an individual is substantially limited in the major life activity of working. Instead, an ADA plaintiff must "produce evidence showing a significant restriction in his 'ability to perform either a class of jobs or a broad range of jobs in various classes ....'" *Bolton*, 36 F.3d at 943 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

In the present case, plaintiff attempts to meet this burden by way of an analogous example found within the EEOC regulations. Relying on the testimony of defendants' vocational expert, Michael J. Dreiling, M.S., plaintiff contends that his lifting restriction precludes him from working in the "very heavy" class [11] of jobs. Jobs falling within the very heavy classification require the ability to occasionally lift over one hundred pounds and repetitiously lift fifty pounds. Because plaintiff can only lift forty-five pounds repetitiously, he is physically disqualified from the very heavy class of jobs. According to plaintiff, therefore, because he is disqualified from the very heavy class of jobs, he has demonstrated that he is restricted from performing a "class" of jobs as used by the EEOC regulations and the *Bolton* court.

To further support this position, plaintiff directs the court's attention to the interpretive guidance section of the EEOC regulations, which states:

> For example, an individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs. This would be so even if the individual were able to perform jobs in another class, *e.g.*, the class of semiskilled jobs.

29 C.F.R. Pt. 1630, App. 1630.2(j).

Plaintiff's argument is supported by a minority of courts that have considered similar situations. *See, e.g., McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 378–79 (6th Cir.1997) (Hillman, J., dissenting) (noting that disqualification from such a class may constitute a disability); *Frix v. Florida Tile Indus., Inc.*, 970 F.Supp. 1027, 1034 (N.D.Ga.1997) (finding plaintiff with permanent lifting restriction associated with back impairment that prevented him from performing heavy and medium labor jobs was disabled); *Rochford v. Town of Cheshire*, 979 F.Supp. 116, 119–20 (D.Conn.1997) (denying summary judgment because plaintiff was excluded from heavy labor jobs and thus was substantially limited in his ability to work). *But see Vaughan v. Harvard Indus., Inc.*, 926 F.Supp. 1340, 1347 (W.D.Tenn.1996) (finding plaintiff not disabled although he could not perform heavy labor), *overruled on other grounds by Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 635 n. 4 (6th Cir.1999).

The court, however, is not persuaded by the reasoning of these minority opinions. First, plaintiff's reliance on the example contained within the interpretive guidelines detracts from the individual, case-by-case examination that is required within the ADA context. Additionally, the court notes that the interpretive section of the EEOC regulations are not controlling but only to be relied upon for guidance. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir.1996). Second, the great weight of authority holds that lifting restrictions alone are insufficient to substantially limit the major life activity of working. *See, e.g., Burgard v. Super Valu Holdings, Inc.*, No. 96–1199, 1997 WL 278974, at *3 (10th Cir. May 27, 1997) (twenty-five pound restriction only limits a narrow range of jobs); *Aucutt v. Six Flags Over Mid–America, Inc.*, 85 F.3d 1311, 1319 (8th Cir.1996) (twenty-five pound lifting restriction); *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 348 (4th Cir.1996) (same); *Otis v. Canadian Valley–Reeves Meat Co.*, No. 94–6308, 1995 WL 216906, at *1 (10th Cir. April 12, 1995).

---

**11.** The United States Department of Labor has classified jobs in the national economy into several classes based on exertional levels: sedentary, light, medium, heavy, and very heavy. *See* 20 C.F.R. § 404.1569a.

Third, plaintiff has failed to present sufficient evidence demonstrating that he is restricted from either a class of jobs or broad range of jobs. *See Bolton,* 36 F.3d at 943–44. Plaintiff could have met this burden by addressing his "vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar training from which [plaintiff] would also be disqualified." *Id.* at 944. · One district court stated the burden as follows:

> Thus, the imposition of a lifting restriction, ... *or even a designation such as light or medium duty,* is not sufficient to establish the existence of a disability ... a plaintiff must go further, offering evidence that these restrictions, in light of his training, skills, vocational opportunities, geographic limitations and the like, significantly impede his ability to find a job.

*Matthews v. TCI of Illinois,* No. 95 C 4096, 1996 WL 332693, at *3 (N.D. Ill. June 14, 1996) (emphasis added).

Plaintiff has identified his geographic limitation to be the areas of Riley and Geary Counties. Plaintiff fails, however, to present evidence detailing the jobs from which he is actually disqualified. Instead, plaintiff asserts that following his termination he underwent a job search within his geographic area. Alleging that he kept his search confined to those jobs that did not require physical activity beyond his restrictions, he located and applied for the following jobs: court clerk, maintenance worker, security officer, sanitation worker, veterinary assistant, and custodial worker. He eventually accepted a position as a custodial worker for Kansas State University in September 1997.[12] The court notes that while completing his employment tasks at Kansas State, plaintiff suffered a physical injury. In his deposition, plaintiff recounted how he believes he was injured.

> I was carrying water buckets up the stairs and as a precursor to that, in November or October, we were moving a heavy conference table that weighed probably around 100 pounds, but there was a student that was assigned to assist me with moving it out of the room so we could do some floor work and he dropped his table, his end of it, and it's believed that was the initial event that weakened the muscle ....

(Pl.'s Dep. at 29).

Considering the number of jobs plaintiff admits he was qualified for, the actual job he accepted, and his apparent abilities in performing this job, the court finds he has failed to produce evidence demonstrating that he is restricted from performing either a class of jobs or a broad range of jobs. In fact, plaintiff has presented no evidence that lends support to the notion that he is unable to find or perform meaningful employment.[13] Plaintiff's impair-

---

**12.** In his deposition, plaintiff testified regarding his job at Kansas State University as follows:

> Question: Okay. Could you tell me what kinds of physical demands that your work with custodial services requires?
> Answer: The only physical demand was lifting 50 pounds repetitively.
> Question: Were you given some kind of test to show you could do that?
> Answer: No, sir.
> Question: You just do it?
> Answer: Yes, sir.
> (Pl.'s Dep. at 27–28).

**13.** Plaintiff does offer the affidavit of Dr. Hansen, which states:

> Mr. Wicks' condition without frequent breaks intervals and assistive devices would

tend to limit his ability to work in jobs using similar training, knowledge, skill or abilities in the area as an animal control officer as noted below. He would also be disqualified from other types of jobs that don't require similar training, knowledge, skills or abilities as the animal control job ....

(Hansen Supp. Aff. at 3). Once again, the court finds that this opinion addresses, in sweeping and conclusory language, a legal conclusion. *See Doren v. Battle Creek Health Sys.,* 187 F.3d 595, 598–99 (6th Cir.1999) (rejecting as insufficient to defeat summary judgment a doctor's affidavit stating in conclusory terms that the plaintiff's "impairments preclude her from engaging in most of [sic] jobs in the local and national economy as a registered nurse").

ment appears, at best, to only restrict him from a narrow range of jobs that require repetitive lifting over forty-five to fifty pounds. *See, e.g., Schneider v. Chas. Seligman Distrib. Co.,* 995 F.Supp. 756, 760 (E.D.Ky.1998) (finding plaintiff with thirty pound lifting restriction and a ten percent whole body impairment restricted only from a narrow range of jobs). Although plaintiff may be disqualified from the position as ACO, this fact alone is unpersuasive. *See Welsh v. City of Tulsa,* 977 F.2d 1415, 1417 (10th Cir.1992) (while working is a major life activity, it does not include necessarily "working at the job of one's choice"). In short, plaintiff has failed to show that his impairment has significantly impeded his ability to find a job. *See Bolton,* 36 F.3d at 944.

### b. Record of Impairment

■ Even though plaintiff has failed to show that any of his identified major life activities are substantially limited, the ADA's definition of "disability" may be satisfied by "a record" of an impairment that substantially limits one or more life activities. *See* 42 U.S.C. § 12102(2)(B). "The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability." 29 C.F.R. Pt. 1630, App. 1630.2(k). To satisfy this section, a plaintiff must demonstrate that "a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment." *Id.* In other words, the record must show an impairment that satisfies the ADA. *See id.*

Plaintiff has not shown any specific record that contains information showing that his impairment has substantially limited any of his major life activities. Plaintiff does argue that his performance evaluation (Ex. 48), which indicates he has trouble with patrolling due to his neck and back injury, serves as a record of his disability. However, this record in no way reflects that plaintiff is substantially limited in a major life activity. *See Sorensen v. University of Utah Hosp.,* 194 F.3d 1084, 1087 (10th Cir.1999) (requiring plaintiff under

the "record of impairment" prong to demonstrate that at some point her impairment substantially limited a major life activity).

■ Defendants direct the court to Dr. Hansen's discharge note (Ex. 39) as the only relevant employment record discussing plaintiff's condition. This record, which releases plaintiff to full-duty without restrictions, is inapposite to plaintiff's proposition. *See Prince v. Claussen,* No. 98–1064, 1999 WL 152282, at *6 (10th Cir. Mar.22, 1999) (finding no record of impairment when plaintiff returned to his job with full medical releases and no work restrictions). Because plaintiff has failed to show that defendants relied on any record demonstrating plaintiff's disability, the court finds that he does not have a "record of impairment." *See generally Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 645 (2d Cir.1998) (denying plaintiffs' claims based on "record of impairment" because the records they produced demonstrated no greater limitations than the continuing impairments they showed).

### c. Regarded as Disabled

■ In the alternative, plaintiff contends that he is disabled under the ADA because defendants regarded him as having an impairment that substantially limits one or more of his major life activities. *See* 42 U.S.C. § 12102(2)(C). The Supreme Court has held that to be "regarded as disabled," a plaintiff must show "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual, non-limiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In other words, even if plaintiff is not actually disabled, he is "disabled" under the ADA if defendants perceived him as such.

The court has interpreted plaintiff's argument as representing the second theory, i.e., defendants mistakenly believed that plaintiff's back impairment substantially limited one or more of his major life activities. Specifically, plaintiff asserts defendants were mistaken regarding his ability to work and sit. To be successful, plaintiff must present sufficient evidence showing that defendants believed he was substantially limited, as previously defined under 42 U.S.C. § 12102(2)(A), in his ability to either work or sit. The only evidence plaintiff offers are his performance reviews and final letter of termination. These statements by Messrs. Yadon and Murphy reflect upon plaintiff's apparent inability to perform his employment tasks, specifically his duty to patrol without breaks.

These statements are insufficient to demonstrate that defendants regarded plaintiff as disabled. As to the activity of working, plaintiff's evidence is insufficient, for it fails to allege that defendants regarded plaintiff as unable to perform either a class of jobs or a broad range of jobs. Plaintiff redirects the court to his arguments regarding the "very heavy" class of jobs. However, even if defendants did believe that plaintiff was incapable of performing heavy labor, the court has already held that such a limitation does not satisfy the "substantial limitation" standard for the major life activity of working.

In regards to the activity of sitting, plaintiff's proffered evidence shows defendants believed that plaintiff could not sit for several hours without a break. As the court has previously noted, such an impairment, even if fully believed by defendants, does not substantially limit the activity of sitting. Therefore, even after viewing the evidence in the light most favorable to plaintiff, the evidence does not demonstrate that defendants regarded plaintiff as disabled.

In light of the above analysis, the court finds plaintiff can not establish that he is disabled under the ADA. Because of this finding, it is unnecessary to discuss the parties' remaining arguments.[14] The court believes summary judgment is appropriate for plaintiff's ADA claim.

### B. Plaintiff's State Law Retaliation Claim

Although Kansas has adopted the general rule that an at-will employee may be discharged at any time, *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779, 781 (1976), the state recognizes an exception to this rule when a employer terminates an employee in retaliation for an employee's exercise of rights under the Kansas Workers' Compensation Act. *See Ortega v. IBP, Inc.*, 255 Kan. 513, 874 P.2d 1188 (1994). A plaintiff may "recover by proving that the discharge was 'based on,' 'because of,' 'motivated by' or 'due to' the employer's intent to retaliate." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir.1998) (quoting *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 815 P.2d 72 (1991)). The plaintiff must establish his claim "by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Ortega,* 874 P.2d at 1198.

In examining these state law claims, federal courts are guided by the analytical framework established in *McDonnell Douglas. See, e.g., Sanjuan,* 160 F.3d at 1298; *Barnard v. ADM Milling Co.,* 987 F.Supp. 1337, 1344 (D.Kan.1997). Therefore, in order to present a claim of retaliatory discharge, plaintiff must first present a prima facie case. To establish a prima facie case under Kansas law, a plaintiff must produce evidence demonstrating that: (1) the plaintiff filed a claim for workers' compensation benefits or sustained an injury for which he might assert a future claim; (2) the employer had knowledge of the plaintiff's compensation claim; (3) the employer terminated the

---

14. In the alternative, even if plaintiff were disabled under the ADA, the court finds that he is not a qualified individual because he can not perform the essential functions of his employment position.

plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination. *Sanjuan,* 160 F.3d at 1298.

If the plaintiff successfully presents a prima facie case, then the defendant employer must offer a non-retaliatory reason for the discharge. Finally, the plaintiff must then rebut the proffered rationale by showing that it is merely pretextual. *See McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1129 (10th Cir.1998) (Noting that to establish pretext, a plaintiff must show "that the tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason.").

Defendants concede that plaintiff has demonstrated the first three elements of the prima facie case. The critical question, therefore, is whether plaintiff has demonstrated the existence of a causal connection between his workers' compensation claim and his eventual termination. A "causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir. 1982). *See also Candelaria v. EG & G Energy Measurements, Inc.,* 33 F.3d 1259, 1261–62 (10th Cir.1994).

▇ In the present case, plaintiff was injured on April 17, 1996, and was eventually terminated in March 1997. The length of time separating defendants' knowledge of plaintiff's injury and his termination is too remote, standing alone, to show causation. *See Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (three-month period, standing alone, is insufficient to establish causation).

Plaintiff asserts, however, that defendants did not know of his nine percent impairment rating until February 4, 1997—roughly one month prior to his termination. In essence, plaintiff argues that defendants did not ascertain the extent or cost of plaintiff's claim until February, thereby shifting the temporal proximity down to one and one-half months or less. *See Ramirez v. Oklahoma Dep't of Mental Health,* 41 F.3d 584, 596 (10th Cir.1994) (finding one and one-half month period may, by itself, establish causation). The court finds this argument lacking in merit, for not only did a year separate plaintiff's injury from his termination, but over five months separated his return to work in October and his termination in March. The court is unpersuaded that the mere knowledge of the exact percentage of plaintiff's injury is sufficient to shift the temporal proximity.

The court has considered plaintiff's additional arguments regarding causation and finds them lacking in merit. However, even if the court were to assume plaintiff had established a prima facie case, he has not sufficiently demonstrated that defendants' proffered reasons for termination are pretextual. Defendants contend that plaintiff was terminated primarily for his insubordination and poor performance reviews. It is plaintiff's burden "to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1321 (10th Cir.1997).

Plaintiff has presented no evidence showing that his alleged instances of insubordination were disingenuous. He does argue that Mr. Murphy was mistaken regarding his ability to appeal his grievance, yet "[a] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual." *Equal Employment Opportunity Comm'n v. Flasher Co.,* 986 F.2d 1312, 1322 n. 12 (10th Cir.1992). In addition, plaintiff argues that the insubordination reasons were mere cover-ups for the retaliatory motive. He bases his argument solely on the fact that the insubordination justifications were only included in his second termination letter. The court finds, however, that this fact is insufficient to create a genuine dispute regarding whether the reason was pretextual.

Plaintiff also argues that the poor performance rationale is pretextual. In support, plaintiff asserts that Mr. Murphy ordered Mr. Yadon to give plaintiff an unsatisfactory rating. No where in the record, however, is this allegation supported by evidence. Plaintiff admits that he was taking unauthorized breaks and not patrolling as directed by Mr. Yadon. He presents no compelling evidence to discredit Mr. Yadon's rationale for rating him unsatisfactory. If Mr. Yadon and Mr. Murphy honestly believed plaintiff was performing poorly, then plaintiff's negative reviews preceding his discharge do not show pretext. *See, e.g., Abioye v. Sundstrand Corp.,* 164 F.3d 364, 368 (7th Cir. 1998). In short, plaintiff's evidence is insufficient to create a triable issue of fact concerning whether defendants' proffered reasons were pretextual. The court, therefore, finds that summary judgment is appropriate.

## IV. CONCLUSION

The court grants summary judgment as to plaintiff's ADA claim because he has failed to sufficiently demonstrate that he is disabled as defined by the ADA. Summary judgment is granted for his retaliatory claim because he failed to present a prima facie case, and in the alternative, plaintiff failed to sufficiently demonstrate that defendants' proffered justifications were pretextual.

**IT IS THEREFORE BY THE COURT ORDERED** that defendants' Motion for Summary Judgment (Doc. 32) is granted.